**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| A.B.S., as surviving daughter of deceased ANTHONY L. SMITH, and a minor, by and through her next friend CHRISTINA WILSON, | ) ) ) ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 4:12-cv-00202-JCH |
| | ) | |
| v. | ) | |
| | ) | |
| BOARD OF POLICE COMMISSIONERS, Et al., | ) ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF A.B.S.'S MOTION TO RE-OPEN DISCOVERY, MOTION FOR SHOW CAUSE HEARING, AND MOTION FOR SANCTIONS**

COMES NOW Plaintiff, by and through the undersigned counsel, and for her Motion to Re-open Discovery, Motion for Show Cause Hearing and Motion for Sanctions states to the Court as follows:

**BACKGROUND**

The instant litigation was filed in 2012 on behalf of A.B.S., a minor, by and through her mother and Next Friend, Christina Wilson, and arose out of the shooting death of Anthony Lamar Smith on December 20, 2011.  A.B.S. is the only child of Mr. Smith and his fiancée, Christina Wilson.  Mr. Smith's mother, Annie Smith, eventually intervened in the litigation as well.  Plaintiffs maintained civil actions for civil rights violations pursuant to 42 U.S.C. §1983 against the Board of Police Commissioners and Officer Stockley, wrongful death under Missouri statutes against Officer Stockley, and a Missouri common law claim Negligent Hiring against the Board of Police Commissioners arising out of the 2011 incident described briefly below.

Mr. Smith was shot and killed by former St. Louis City Metropolitan Police Officer Jason Stockley in what Officer Stockley claimed was self-defense following an alleged drug transaction by Mr. Smith and high speed chase on the streets of St. Louis City.  Officer Stockley claims he observed Mr. Smith reaching for a firearm between the center console and passenger seat of his vehicle when Officer Stockely discharged five (5) rounds of ammunition at close range into Mr. Smith, causing his death.

Immediately after the shooting, Officer Stockley returned (wearing gloves) to his vehicle and rummaged through a bag in the backseat with his back blocking a camera trained on that area.  He removed an item from the bag and returned (gloveless) and empty handed to the area of the vehicle in which Mr. Smith was situated.  Officer Stockley claimed he was retrieving an anti-clotting agent to use on Mr. Smith's wounds and subsequently elected not to apply same when he returned to the area of Mr. Smith's vehicle and purportedly observed the wounds were too severe for the product to be of any use.  The Plaintiffs' theory was Officer Stockley retrieved a firearm from his bag, which he then claimed to locate in Mr. Smith's vehicle.  The firearm was a Taurus revolver containing three (3) rounds of ammunition.  There was no allegation Mr. Smith ever discharged a firearm.

The firearm dispute was central to the litigation.  Liability hinged on whether Officer Stockley acted in self-defense.  The key fact in the self-defense dispute is whether Mr. Smith possessed a firearm at the time Officer Stockley shot him.  If Mr. Smith was unarmed, establishing liability against the Defendants was a foregone conclusion and the Defendants' exposure to damages was high.

The direct evidence on this issue obtained during discovery consisted of (1) witness statements from Officer Stockley and his partner Brian Bianchi; (2) audiovisual materials

obtained from the restaurant from which the car chase started; and (3) audiovisual recordings from the inside Officer Stockley's vehicle made during the chase, during and after the shooting. No fingerprints were recovered from the firearm.  No DNA evidence was disclosed to Plaintiffs. As more fully set forth below, Plaintiffs were led to believe Defendants participated in discovery in good faith and had produced all responsive documents and information in their possession prior to the mediation.  As a result, the parties engaged in a mediation on June 20, 2013, which resulted in a settlement subsequently approved by the Court.

## TIMELINE OF EVENTS

Officer Jason Stockley killed Anthony Lamar Smith on December 20, 2011.  Plaintiff filed this lawsuit on February 6, 2012.  At the time of the lawsuit[1], the Missouri Attorney General's Office represented the Board of Police Commissioners and Defendant Stockley.  Dana Walker Tucker (now Dana Redwing) represented and was lead counsel for the Board of Police Commissioners and Defendant Stockley.  On May 15, 2012, the Court entered its Case Management Order mandating discovery be complete by May 15, 2013 and mediation be completed by June 15, 2013.

Plaintiff served her First Requests for Production of Documents on Defendants on July 5, 2012.  Within those requests was a request for "All copies and drafts of written police reports, investigative reports, computer media and written memoranda with regard to the fact situation giving rise to the instant litigation".  The Request was the subject of Plaintiff's Motion to Compel filed with this Court January 28, 2013 (Doc. 28) and the subject of the hearing on March 1, 2013.  Plaintiff also served her First Interrogatories on Defendants on July 5, 2012.  Within those interrogatories was the inquiry "Was an investigation into the subject shooting conducted?

---

[1] On August 31, 2013, as a result of a vote on "Local Control", responsibility for the St. Louis Metropolitan Police Department and its officers shifted to St. Louis City and, thereby, defending the department and its officers in civil litigation became the obligation of the City Counselor's Office.

. . . Produce a copy of all materials, written or otherwise, generated as a result of the investigation . . . ."

In August 2012, Defendants produced limited responsive materials and advised Plaintiff additional responsive materials were being withheld due to an ongoing investigation by the SLMPD Internal Affairs Division and that such responses would be timely supplemented by Defendants. A true and correct copy of these Interrogatories and Defendants' responses thereto are attached hereto as Exhibit 1.  As a result of the representation of Defendants that materials were being withheld due to an active IAD investigation, in August 2012, the parties informally stayed further discovery pending resolution of the IAD investigation as well as the active FBI investigation into the shooting.

In November 2012, Albert Watkins and Michael Schwade met with United States Attorney Richard Callahan who advised the FBI investigation had concluded and his office would not be filing any charges against Officer Stockley.  On January 2, 2013, Plaintiff's counsel sent a letter to Ms. Redwing requesting Defendants produce all materials and information previously requested on July 5, 2012 and inquired into the status of the IAD investigation.  In response, on January 10, 2013, Defendants produced additional responsive documents, but advised additional responsive materials were being withheld because they are evidence and are in the custody of IAD, while the investigation continues.  Defendants again committed to timely supplement.

On January 28, 2013, Plaintiff filed a Motion to Compel Discovery.  The issue to be resolved was Defendants withholding of responsive documents in the possession of the SLMPD's Internal Affairs Division.

On January 31, 2013, Defendants produced additional documents to Plaintiff.

As a result of the additional disclosures, on February 15, 2013, Plaintiff issued her Second Request for Production of Documents to Defendants.  One of those requests was for "[a]ll documents, reports, and photographs created by and for the Defendants as a part of their investigation into the incident giving rise to the instant litigation, including but not limited to, photographs of the scene and evidence taken therefrom, . . ."  A true and correct copy of these requests and Defendants' response thereto is attached hereto as Exhibit 2.

Plaintiff filed her Motion to Compel on January 28, 2013 (Doc. 28) and the Court heard argument on same on March 1, 2013.  Mr. Watkins appeared for the Plaintiff, James Schottel appeared for Intervenor Annie Smith, and Ms. Redwing appeared for the Defendants.  During the hearing, Ms. Redwing advised the Court, "[t]he FBI then decided that they weren't going to prosecute the case.  They did in fact turn everything back over to IAD . . ."  At the conclusion of the hearing, the Court ordered Defendants to produce all records and materials related to the IAD investigation as well as the FBI investigation to the Plaintiff.

On March 4, 2013 H. Anthony Relys, Esq. entered his appearance as co-counsel on behalf of Defendants.  On April 9, 2013, Defendants filed two Motions for Protective Order regarding production of records and materials from the IAD file.  The purpose of the protective order sought was stated to be to keep the materials produced confidential from the public due to an ongoing internal investigation within the SLMPD and due to potential criminal charges being filed against Officer Stockley.

On April 10, 2013, Defendants produced additional records from the SLMPD IAD file.  For the first time, Plaintiff received a December 22, 2011 Laboratory Report created by SLMPD Firearms Examiner David Menendez indicating DNA swabs were taken of the Taurus revolver allegedly recovered from Mr. Smith's vehicle.  There was no indication in the documents

produced that those swabs were ever processed for DNA or that any DNA was located on the firearm.  Upon receiving this information, Albert Watkins inquired of Ms. Redwing on two separate occasions whether there those swabs were tested and, if so, whether they yielded any DNA evidence.  Ms. Redwing advised Mr. Watkins that no DNA evidence had been recovered or identified from the revolver.

In early June 2013, Plaintiff scheduled the deposition of various SLMPD witnesses, including the SLMPD Inspector of Police.  On June 12, 2013, Ms. Redwing issued an email to Plaintiff's counsel advising a different Assistant Attorney General would be entering an appearance on behalf of Defendant Stockley because, during her preparation for depositions, it became clear to Ms. Redwing that she had a direct conflict of interest as it relates to Jason Stockley.  Ms. Redwing advised the conflict of interest in combination with the new counsel's need to get up to date with the litigation required the depositions of the SLMPD personnel be canceled, but the mediation could move forward.  The depositions were cancelled accordingly. On June 14, 2013, Robert Isaacson entered his appearance on behalf of Defendant Stockley.  The conflict of interest that arose with regard to Ms. Redwing and Mr. Relys, on the one hand, and Officer Stockley, on the other, has never been explained to Plaintiff.  Similarly, how adding another attorney from the Attorney General's Office cures the undisclosed conflict has not been explained to Plaintiff.  It appears to Plaintiff this maneuver was merely intended to avoid Defendants' appearing under oath for deposition prior to the Court ordered mediation.

On June 18, 2013, two days before the mediation, Mr. Watkins again spoke with Ms. Redwing via telephone concerning Plaintiff's discovery requests and was advised there were no additional records or materials to be provided to Plaintiff.  On June 20, 2013, the parties mediated this matter at the offices of United States Arbitration & Mediation in St. Louis with

former federal judge, the Hon. Steven Limbaugh, Sr., serving as mediator.  The parties reached a (now publicly confirmed) agreement to settle the litigation for the sum of $900,000, which was subsequently approved by the Court.  Plaintiff believed that was the end of the matter.

On May 16, 2016 Officer Stockley was arrested in Texas on a Criminal Complaint of Murder issued by the Circuit Attorney's Office for the City of St. Louis.  The May 12, 2016 Probable Cause statement supporting the charge stated, "a gun was recovered from the victim's car but was later determined by lab analysis to have only the Defendant's DNA on it."  It was reported in St. Louis media that the Circuit Attorney disclosed Mr. Stockley's DNA had been discovered on the seized Taurus revolver and that the DNA evidence was identified in 2012.  This was news to Plaintiff and her counsel…appallingly shocking news.

On May 17, 2016 and May 18, 2016, a reporter with The St. Louis Riverfront Times questioned the Attorney General's Office's Press Secretary whether the AG's office knew of the DNA evidence and, if so, why it was not disclosed to Plaintiff.  The AGO's Press Secretary is reported to have said, ". . . to our office's knowledge, no DNA evidence was available."

On June 1, 2016, The St. Louis Post-Dispatch published an article on the bond hearing of Jason Stockley during which his defense attorney, Neil Bruntrager, Esq., is reported to have stated in open court there was no new evidence in the Stockley murder case and "nothing new occurred after the summer of 2012".  After retrieving the litigation file from storage and re-review of internal notes and files and making unsuccessful efforts to obtain the DNA evidence, Albert Watkins issued a letter to the City Counselor's Office on June 22, 2016 inquiring about the DNA evidence.  A true and correct copy of that correspondence is attached hereto as Exhibit 3.

On June 23, 2016, and in response to the aforementioned letter, <u>The St. Louis Post-Dispatch</u> inquired of the AGO's Press Secretary further about Plaintiff's allegation of withheld DNA evidence.  The Press Secretary reportedly responded, "We thoroughly reviewed our case file, and we found no indication that the AGO ever received a DNA report analyzing the handgun.  Our records indicate that we gave every report and video in our possession to Plaintiffs' counsel."

On June 28, 2016, Joel Poole, Esq., formerly the Chief Counsel of the AGO's Litigation Division, issued a letter to Mr. Watkins stating, "Our Office has thoroughly reviewed our entire file.  As we have previously stated, every report and every video in the Attorney General's office was produced to you and your firm as part of the discovery process.  In this regard, your file and our office's file contained the same information."  A true and correct copy of this letter is attached hereto as Exhibit 4.

Officer Stockley waived his right to a jury and stood trial for the murder of Anthony Lamar Smith before the Hon. Timothy Wilson in the Circuit Court of the City of St. Louis from August 1 – August 9, 2017.  Mr. Stockley was found Not Guilty on September 15, 2017.  With the trial concluded, the rumored DNA evidence was a part of the public record.  Plaintiff learned there are two DNA laboratory reports at issue.

The first report is dated February 12, 2012 in which SLMPD Laboratory Technician, Dr. Karen Preiter, described her analysis of DNA swabs of the revolver.  She concluded Officer Stockley's DNA was the only identifiable DNA contained on the swab of the trigger, grip and rough areas of the revolver.  In June 2012, an additional swab was taken from the head of a screw located on the revolver and preserved for later processing.  In a Laboratory Report dated July 31, 2012, Dr. Preiter described her July 12, 2012 analysis of the swab and concluded Officer

Stockley's DNA was the only identifiable DNA on the swab taken from the screw on the revolver.

As a result of the election of Josh Hawley as Missouri Attorney General in November 2016, several individuals, including Mr. Poole, left the AG's office for other employment.  On September 18, 2017, Albert Watkins issued a letter to new Chief Counsel of the Litigation Division, Michael Quinlan, Esq., regarding the failure to disclose DNA evidence and Mr. Poole's prior evasive response to Plaintiff's inquiry.  A true and correct copy of this letter, without its referenced attachments, is attached hereto as Exhibit 5.  Albert Watkins specifically took issue with Mr. Poole's statement that the DNA evidence was not in the AG's possession.  As counsel for the SLMPD, by and through its Board of Police Commissioners, it was the AG's discovery obligation in this litigation to produce responsive documents and information within the possession of its client.  Failure to obtain responsive documents from one's client is not an acceptable reason not to produce otherwise responsive material.  Whether the documents were in the AG's possession was immaterial to whether Defendant complied with Plaintiff's discovery requests.  At this time, it appeared to Plaintiff Mr. Poole was asserting the DNA evidence was not produced because the AG never received it from the SLMPD.

In response to the September 18, 2017 letter, D. John Sauer, Esq., First Assistant to the Attorney General and State Solicitor issued a letter dated September 25, 2017 to Albert Watkins stating the Attorney General's Office conducted an initial review of Plaintiff's allegations and determined to appoint independent, outside counsel to thoroughly investigate same.  A true and accurate copy of this letter is attached hereto as Exhibit 6.  Mr. Sauer concurred with Plaintiff's assessment these allegations deserve "a full, accurate and transparent response."

The September 25, 2017 letter further advised Plaintiff that the AG's office no longer represents the (defunct) Board of Police Commissioners and will not prospectively represent those Defendants in any prospective action.  It was suggested Plaintiff direct its demands to the City Counselor.  The AG's Office further cited Rule 4-1.10 of the Rules of Professional Responsibility, which relates to conflicts of interest, in advising that it would not respond to Plaintiff's requests for information concerning the DNA evidence.

Shortly after receiving the September 25, 2017 letter, Plaintiff was contacted by Hal Goldsmith, Esq. who advised he had been named by the AG's office and would be leading an investigation of Plaintiff's claims at the direction of the AG's office.  Accordingly, Plaintiff issued a letter dated October 2, 2017 to the City Counselor's Office renewing the claims and requests for information relating to the DNA evidence, given the instructions of the AG's office. A true and correct copy of this letter is attached hereto as Exhibit 7.

On October 4, 2017, the newly appointed City Counselor Julian Bush responded via letter.  A true and correct copy of same is attached as Exhibit 8.  Therein, Mr. Bush advises the City has inherited the liabilities of the disbanded Board of Police Commissioners.  Mr. Bush further advised, in anticipation of litigation, he has assigned one of his (unnamed) deputies to "get to the bottom" of this matter.  Mr. Bush inquired whether his deputy could expect Plaintiff's cooperation if she deemed it helpful.  At the end of his letter, Mr. Bush expresses familiarity with and confidence in Mr. Goldsmith.  Mr. Bush requested Plaintiff's counsel confirm he will "transparently cooperate" with Mr. Goldsmith, as though the cooperation or non-cooperation of Albert Watkins would play a role in or impact reconciliation of the failure of the Board and the AG's office to discharge its production obligations.

Interestingly, Plaintiff's counsel has never been contacted by Mr. Bush's deputy as part of any investigation of Plaintiff's claims.  Plaintiff's counsel would have gladly cooperated with any such investigation.  No findings of any such investigation, if one indeed took place, have been made known to Plaintiff, much less public.

Mr. Goldsmith's investigation, however, is complete.  Plaintiff's counsel met with Mr. Goldsmith and a colleague on multiple occasions and cooperated completely with the investigation.  On December 5, 2017, Mr. Goldsmith released his Report to the Missouri Attorney General ("Report").  Within the Report, Mr. Goldsmith indicates the Report is "carefully edited to remove privileged and client-confidential information" and that a "complete Report of the investigation has been provided to the Attorney General's Office, containing a detailed account of interviews and information obtained during this investigation, but the complete Report cannot be publicly disclosed without a waiver of privilege and confidentiality by the AGO's former clients, the now non-existent Board and Officer Stockley," this despite the previously published written commitment by the AG's office to transparency relative to Mr. Goldsmith's Report detailing his findings.  In a presumed expression of professional frustration, Mr. Goldsmith noted as a matter of record that he has requested such waivers, but they have not been received.  Accordingly, the only version of the Report available to Plaintiff is the redacted one.  A copy of the redacted Report is attached hereto as Exhibit 9.  No basis for the purported privilege has been disclosed.  The AG's office's prior commitment to transparency appears to have been illusory.  Should discovery in this matter be re-opened, Plaintiff intends to request a complete copy of the Report and, if not produced, a privilege log setting forth the basis for withholding any portion thereof.

The Report indicates its conclusions are reached after an investigation including review of "pertinent records, including AGO files, SLMPD files, email communications of AGO personnel, District Court files, and the files of Plaintiff's attorneys".  The Report also indicates it is based upon interviews of witnesses, "including Plaintiff's attorney, the former Assistant Attorney General who defended the Board and Officer Stockley during the civil case, two other Assistant Attorneys General involved in the case, the attorney for the Board, the lead SLMPD investigator for the shooting incident involving Officer Stockley, the former SLMPD Inspector of Police, the former interim City Counselor, and former Officer Stockley's criminal defense attorney."  The Report states, "[a] detailed report of the results of these interviews and review of records has been provided to the Attorney General's Office as part of the investigation."

The Report makes the following conclusions:

- **It is clear from our investigation that AAG 1 was aware, *prior to the June 20, 2013 Mediation conference,* of the DNA lab test results reflecting Stockley's DNA having been recovered from the Taurus revolver, and that these DNA lab test results were not produced to the Plaintiff in discovery.**

- **Plaintiff's formal discovery requests served upon Defendants, both the Requests for Production of Documents and the Interrogatories, were broad enough to require the pertinent DNA test result information to be produced during discovery.**

- **U.S. District Court Judge Hamilton's March 1, 2013 Order required Defendants to produce the entire SLMPD IAD and the FBI files to Plaintiff. The DNA test result information should have been produced pursuant to that Court's Order and Plaintiff's discovery requests.**

- **Neither of Dr. Preiter's written Laboratory Reports was produced to Plaintiff in discovery prior to the June 20, 2013 Mediation and settlement.**

- **[T]he AGO, through at least one AAG, was aware of the DNA laboratory test result information prior to the June 20, 2013 Mediation and settlement, as were many agents of the Board.**

- **While it is clear that the AGO failed to produce the known DNA test results to Plaintiff, it is not clear from our investigation why that information was not produced.**

- **The pertinent Laboratory Reports were not contained within the AGO's files when we reviewed them during our investigation.**

- **[A]long with other records and materials contained within the SLMPD files related to the December 20, 2011 shooting incident, Officer Menendez' and Dr. Preiter's written Laboratory Reports concerning the DNA evidence were provided by SLMPD to both the Circuit Attorney's Office and the United States Attorney's Office during 2012.**

- **[W]e reviewed Plaintiff's allegation that the AGO's June 28, 2016 letter, in response to Plaintiff's counsel's June 22, 2016 inquiry concerning the DNA testing results and video recording, was intentionally non-responsive.  While the AGO's response letter was factually accurate in advising Plaintiff's counsel that the AGO's file contained no "report" concerning DNA testing which was not produced to Plaintiff during discovery, it failed to advise Plaintiff's counsel that at least one AAG, the lead AAG, was in fact aware of the DNA testing results prior to the June 20, 2013 Mediation and settlement.**

These conclusions are deeply troubling to Plaintiff and her counsel.  Without being presumptuous, we suspect they may be deeply troubling to the Court too.  It is Plaintiff's position that there were intentional abuses of the federal discovery process by Defendants and their counsel in this litigation.  It is the Plaintiff's position that there was willful violation and disregard of this Court's March 1, 2013 Order.  Neither Plaintiff nor her counsel make these allegations casually.  We make them only after cautious and deliberate evaluation of facts.  The discovery abuses are patently sanctionable.  The violation of this Court's Order is nothing short of contumacious.  The subsequent misleading statement by Mr. Poole suggests these actions are systemic and part of an ongoing scheme to shroud the prior deception and obfuscation.  This matter merits, nay screams for, further scrutiny and, ultimately, accountability.

To that end, Plaintiff seeks access to and/or disclosure of the complete Goldsmith Report. With the exception of their own files and participation in meetings and correspondence with Mr.

Goldsmith, Plaintiff's counsel has no access to the materials upon which the conclusions set forth in the Report are based.  The Report itself is, evidentiary speaking, hearsay.  The full Report and the materials supporting its conclusions should be illuminated to the Court and to the Plaintiff and the public.

To that end, Plaintiff issued separate requests to Defendant Stockley's criminal defense counsel and to the City Counselor seeking waiver of any privilege cited by the AGO as the basis for withholding Mr. Goldsmith's full Report.  Plaintiff has received no response from Mr. Stockley.  The City Counselor advised he has forwarded our request to his employee Mark Lawson, former Secretary of the Board of Police Commissioners.  It is also worth noting, upon information and belief, Mr. Relys, co-counsel for Defendants in this litigation, is also currently employed with the City Counselor's Office and, presumably, available to the City Counselor for inquiry into this matter.  No further response has been received from the City Counselor as of the date of this Motion.  Given the totality of the circumstances, this silence is maddeningly deafening.

## **LEGAL AUTHORITY**

The authority of the federal judiciary to issue sanctions for discovery abuses arises from FRCP 26(g), FRCP 37, and its historic inherent authority.  Here, Plaintiff seeks sanctions derived from each of those sources.  Plaintiff further seeks a show cause order pursuant to the Court's inherent authority to enforce its orders through contempt proceedings.

The United States Supreme Court addressed issues of sanctions and contempt at the district court level in back-to-back terms in 1990 and 1991.  Prior to the 1993 amendment to Rule 11, sanctions for discovery abuses were typically handled through Rule 11.  It is in that context Rule 11 was addressed by the Supreme Court in *Cooter & Gell v. Hartmarx Corp.*, 496

U.S. 384 (1990) and *Chambers v. Nasco, Inc.*, 501 U.S. 32 (1991).  As the Committee Notes to the 1993 amendment to Rule 11 make clear, pursuant to FRCP 11(d), Rule 11 is no longer to be used to enforce discovery abuses, insomuch as Rules 26(g) and 37 are now in place to address same.  The analysis regarding the Court's continuing jurisdiction to impose sanctions after termination of litigation, however remains applicable.

In *Cooter & Gell*, the Court was faced with a situation in which a district court imposed sanctions pursuant to Rule 11 after a voluntary dismissal was filed and litigation was terminated.  The sanctioned party claimed the court lacked jurisdiction to enter an order for sanctions after the conclusion of litigation.  The Supreme Court disagreed and held the signing and filing of the offending document is what triggers a Rule 11 violation and a voluntary dismissal does not expunge the violation.  The Court reasoned a Rule 11 sanction is not a judgment on the action's merits, but simply requires the determination of a collateral issue: whether the attorney has abused the judicial process, and, if so, what sanction would be appropriate.  Such a determination may be made after the principal suit has been terminated.  *Cooter & Gell*, supra at 396.  "A court may make an adjudication of contempt and impose a contempt sanction even after the action in which the contempt arose has been terminated." *Id.* (citing *United States v. Mine Workers*, 330 U.S. 258, 294 (1947)).

The following year, in *Chambers v. Nasco, Inc.*, the U.S. Supreme Court reviewed a district court's sanctions order entered after trial on the merits against a party who acted in bad faith in perpetrating a fraud upon the court when it attempted to deprive the court of jurisdiction through false filings and representations.  The fraud was not exposed until after trial so it would have been impossible to impose sanctions at the time the papers were filed.  The district court declined to impose sanctions pursuant to Rule 11 or 28 U.S.C. §1927, finding them inapplicable

to the facts at hand.  Instead the district court imposed a $996,644.65 sanction for attorneys' fees of the victimized party pursuant to the court's inherent authority.  Reviewing that decision, the Supreme Court engaged in a lengthy discussion of the inherent authority of federal courts.

Specifically, the Court noted courts have inherent authority "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases."  *Chambers*, supra at 43 (citing *Link v. Wabash R. Co.*, 370 U.S. 626, 630-631 (1962)).  The Court went on to reiterate "[t]he power to punish for contempts is inherent in all courts." *Chambers*, supra at 44 (citing *Ex parte Robinson*, 19 Wall 505, 510 (1874)).  This power reaches both conduct before the court and that beyond the court's confines.  *Id.* (citing *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 798 (1987)).  The "inherent power also allows a federal court to vacate its own judgment upon proof that a fraud has been perpetrated upon the court because the historic power of equity to set aside fraudulently begotten judgments is necessary to the <u>integrity</u> of the courts, for 'tampering with the administration of justice in [this] manner . . . involves far more than an injury against a single litigant. It is a wrong against the institutions set up to protect and safeguard the public'".  *Id.* (citing *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944)) (emphasis added).  Similarly, the court has the power to conduct an independent investigation in order to determine whether it has been the victim of fraud.  *Id.* (citing *Universal Oil Products Co. v. Root Refining Co.*, 328 U.S. 575, 580 (1946)).

Appropriately, the *Chambers* Court cautioned against using the inherent authority of the courts except in cases where it is clearly warranted.  The Court wrote, "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion.  A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the

judicial process." *Id.* at 44-45 (internal citations omitted).  Finally, when considering whether 28 U.S.C. §1927, Rule 11 or any other Rule precludes reliance upon inherent authority to sanction, the Court held, "We discern no basis for holding that the sanctioning scheme of the statute and the rule displaces the inherent power to impose sanctions for the bad-faith conduct described above." *Id.* at 46.  Importantly here, later in its *Chambers* opinion, the Court writes, "even under Rule 11, sanctions may be imposed years after a judgment on the merits."  *Id.* at 56 (citing Advisory Committee Notes on 1983 Amendment to Rule 11)).

Thus it is clear to Plaintiff the Court retains jurisdiction to consider contempt or sanctions against Defendants and their counsel pursuant to Rule or by invoking the Court's inherent authority.  The Court should invoke this authority by issuing a show cause order to Defendants and their counsel compelling them to appear before the Court and show cause why they should not be held in contempt for failure to obey this Court's March 1, 2013 Order.  The Court should invoke its authority to issue sanctions[2] against Defendants and their counsel.  Prior to either of those steps, the Court should permit Plaintiff to conduct limited discovery on the allegations of misconduct set forth above to further illuminate the existence, nature and scope of any such misconduct for the purpose of informing the Court's decision of what remedy or remedies are most appropriate under the circumstances.

## CONCLUSION

Use of force by law enforcement has always been and presently is an appropriately sensitive hot button issue in this country, an issue which has only gotten hotter since Ferguson, the "Black Lives Matter" movement and the Stockley murder trial verdict.  But for the conduct set forth above, this case would have been "Ferguson".  It is axiomatic America is a nation of

---

[2] This Motion has not been served upon Defendants in advance of filing because doing so would be futile insomuch as this matter has been concluded since 2013 and Defendants' withdrawal of the offending papers or supplement of discovery production would serve no practical purpose at this stage.

laws.  The rule of law is the foundation upon which our government is built and simultaneously the substance which separates civilized society from anarchy.  While perhaps the lowest and most recognizable rung on the ladder of American power, we are not here to talk about excessive force today.   The abuse of power chronicled here climbs many rungs higher and leads directly into the Attorney General's office.  For Anthony Lamar Smith, the distinction matters not.  He is dead.  His encounter with American justice ended on the rainy streets of North St. Louis.  For his family, the African-American community and all citizens of our nation, this could not be more important.  What solace was taken in May 2016 knowing our criminal justice system would weigh Jason Stockley was simultaneously tainted with the disclosure that he would be confronted with the very evidence inexcusably hidden from Plaintiff years prior.

The fight over whether the justice system failed Anthony Lamar Smith was settled on June 20, 2013.  This fight has larger implications.  Jason Stockley's defense in his murder trial was premised on the assertion he made a series of questionable decisions in the heat of a tense and rapidly evolving situation.  The Attorney General's Office made a series of deliberate decisions within the civil rights case in this Court from the taxpayer funded comfort of a public office building after cool reflection and internal discussion.  While their role in the justice system may not be as literally lethal as Officer Stockley's firearm, the litigation counsel in the Attorney General's office are positioned with responsibilities of wider implication to the justice system writ large than an individual beat cop.  They are highly educated public officials, licensed to practice law as agents of the court, employed at the behest of the top law enforcement official in this State and charged with representing the legal interests of the people of the State of Missouri competently, ethically, professionally, honestly and as agents of the court.  If society and our courts cannot rely upon its Attorneys General to exhibit integrity in the performance and

discharge of their duties, the damage they inflict upon the justice system, this nation and party litigants is far greater than that which came from the end of Mr. Stockley's firearm.

Finally, and with full awareness this document may be consumed by the public, Plaintiff wishes to be clear.  Plaintiff has no regret about the deal made on June 20, 2013.  Based on the documents and information exchanged in that litigation, it was fair.  Unfortunately, it was premised on fraud and deceit.  Had Plaintiff been in possession of the DNA evidence, Plaintiff's liability case against Defendants would have, objectively, been materially stronger and she would not have settled on the terms she did.  Defendants and their counsel know it and that is why they did what they did.  The time has come to right this wrong.  Lady Justice abhors betrayal by those upon whom she relies to do that which is just.  Timely healing is required.

## **RELIEF SOUGHT**

The Plaintiff seeks the following:

(1) Re-opening of discovery in this litigation for the limited purpose of determining when the Defendants and their counsel obtained the DNA reports referenced above, who had access to same and why they were not disclosed to Plaintiff during discovery;

(2) An Order from the Court requiring the Attorney General to release the full Goldsmith Report or, in the alternative, *in camera* review of same by the Court pending further determination of additional disclosure of same;

(3) An Order for Defendants and their attorneys to show cause why they should not be held in contempt of Court for failure to comply with this Court's March 1, 2013 Order as it relates to production and/or disclosure of the DNA reports; and

(4) Sanctions against Defendants and/or their counsel for abuse of the discovery process during this litigation, including, but not limited to, Plaintiff's reasonable attorneys' fees in bringing this Motion.

KODNER WATKINS, LC


_____/s/ Albert S. Watkins_____
By: ALBERT S. WATKINS, LC #34553MO

MICHAEL D. SCHWADE, #60862MO
The Bank of America Building
7800 Forsyth Blvd., Suite 700
Clayton, Missouri 63105
314-727-9111 (telephone)
314-727-9110 (facsimile)
albertswatkins@kwklaw.net
mschwade@kwklaw.net

*Attorneys for Plaintiff*


### CERTIFICATE OF SERVICE

Signature above is certification that on this the 18th day of December, 2017 a true and correct copy of the foregoing document was electronically transmitted to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic filing to all counsel of record.  Certification is also made a true and correct copy of the above and foregoing document was served to the following:

Dana Redwing (Tucker), Esq. (via email and U.S. Mail)
Fox Galvin, LLC
One South Memorial Drive, 12th Floor
St. Louis, Missouri 63102
dredwing@foxgalvin.com

Counsel for the defunct Board of Police Commissioners

Julian Bush, Esq. (via email and U.S. Mail)
H. Anthony Relys, Esq.
City of St. Louis, Law Department
1200 Market Street, Room 314
St. Louis, MO 63103-2864
bushj@stlouis-mo.gov

St. Louis City Counselor, successor in interest to the defunct Board of Police Commissioners (Mr. Bush)
Counsel for the Defunct Board of Police Commissioners (Mr. Relys)

Neil J. Bruntrager, Esq. (via email and U.S. Mail)
225 S Meramec Ave #1200
St. Louis, MO 63105
njbatty@aol.com

Criminal defense counsel for Defendant Stockley

Joel Poole, Esq. (via email and U.S. Mail)
227 University Hall

Columbia, MO 65211
poolej@umsystem.edu

Former counsel for the Missouri Attorney General

D. John Sauer, Esq. (via U.S. Mail only)
First Assistant and State Solicitor
Attorney General of Missouri
P.O. Box 899
Jefferson City, MO 65102

Counsel for Missouri Attorney General